# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : Crim. No. 1:19-CR-0328 |
| | : |
| v. | : |
| | : |
| ANTHONY HASKINS | : Judge Jennifer P. Wilson |

## MEMORANDUM

Before the court is a motion to suppress evidence filed by Defendant Anthony Haskins ("Haskins"). (Doc. 58.) The motion seeks to suppress all physical evidence obtained by police on the night of Haskins' arrest as fruits of an unlawful search and seizure. For the following reasons, the court will deny the motion to suppress.

### FACTUAL BACKGROUND AND PROCEDURAL HISTORY

By Indictment filed November 11, 2019, Haskins was charged with possession with intent to distribute cocaine base and cocaine in violation of 21 U.S.C. § 841(a) (Count I), possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A) (Count II), and felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1) (Count III). (Doc. 1.) Haskins has entered a plea of not guilty. (Doc. 12.)

Although Haskins was appointed counsel, he requested permission to proceed *pro se*, which was granted. (Docs. 33, 55.) Thereafter, Haskins filed the

instant motion to suppress. (Doc. 58.) The court convened a suppression hearing on May 24, 2021, which carried into a second day on June 14, 2021. After the hearing, Haskins filed a supplemental brief in support of the motion, which the court permitted him to amend on August 11, 2021. (Docs. 133, 138, 139.) The Government filed its supplemental brief in opposition to the motion on August 10, 2021. (Doc. 137.) Haskins then filed a reply to the Government's supplemental brief on August 23, 2021. (Doc. 144.) Accordingly, Haskins' motion is ripe for review.

## JURISDICTION

This court has jurisdiction under 18 U.S.C. § 3231, which gives district courts original jurisdiction over cases in which offenses against the laws of the United States are alleged.

## FINDINGS OF FACT

The court has reviewed the testimony and exhibits introduced across both days of the suppression hearing.[1] Based on the review of this evidence, the court makes the following findings of fact.

Officer Chad McGowan of the Harrisburg City Police Department and Special Agent Daril Foose (currently of the Drug Enforcement Agency but previously, during the relevant period, with the Harrisburg City Police

---

[1] The recently retired Judge John E. Jones III presided over the suppression hearing.

Department) testified on behalf of the Government at the suppression hearing. On the evening of October 5, 2018, Officers Foose and McGowan were assigned to the street crimes unit, which proactively monitors the city for "street-level crimes that are in progress or target high-drug, high-crime areas." (Tr., p. 105.) The two officers were patrolling in an unmarked police vehicle, a black Cadillac Escalade. (*Id.* at 106.)

At approximately 8:30 p.m., the officers were in the area of Susquehanna and Calder Streets in Harrisburg, traveling northbound on the 1300 block of Susquehanna Street. (*Id.* at 107.) Officer McGowan described the area as "one of the most crime-ridden areas I've experienced to date," while Agent Foose likewise testified that this section of the city is a "high-crime high-drug area." (*Id.* at 6, 109.) As they approached Calder Street, they observed a male walking eastbound on Calder Street. The officers believed—although Defendant disputes this—that the male looked back toward the unmarked vehicle before turning the corner onto Susquehanna Street. (*Id.* at 108.) The officers then observed the male exhibit "extremely odd" behavior while also walking in an "oddly slow" manner. (*Id.* at 109–110.) Officer McGowan testified that the man's arms "were not swinging freely at his sides, like most people do when they walk," and that "[i]t seemed like he was very concerned with the front of his waist," although Officer McGowan acknowledged that he could not tell exactly what the male "was focused on or what

he was trying to manipulate" towards the front of his body. (*Id.* at 7–8.) Both officers then witnessed the male approach a trash can outside a residential home—later identified as 268 Calder Street. (*Id.* at 10, 109.) When he approached the trashcan, he exhibited further strange behavior. Agent Foose described it as "spread[ing] his body" so that his arms were wide, "almost as if he was encompassing the trash can completely." (*Id.* at 109.) Officer McGowan observed him pause in front of the trash can—again "very focused on the front of his body, the front of his waist"—and raise his arms, "almost like he [was trying] to fan his back out, [to] make himself as big as possible." (*Id.* at 10–11). The man then lifted the lid of the trash can and discarded something within it. (*Id.* at 11.) He then turned toward the wooden fence of 268 Calder Street and entered the yard. (*Id.* at 48.)

Both officers exited their vehicle around the time Haskins entered the backyard through the wooden gate. Officer McGowan approached the trash can and observed "two very clean fresh plastic baggies resting on top of the trash." (*Id.* at 12.) These were later confirmed to contain illicit drugs. (*Id.* at 199.)

At the same time, Agent Foose exited the car and heard a "metal-on-metal sound," which she thought was the sound of a storm door closing, as if someone had entered the home through the backyard. (*Id.* at 110.) She approached the wooden fence and shined her flashlight through the narrow wooden slits. (*Id.* at

4

111.) She recognized the man in the backyard as Haskins (from previous encounters), and she told him he did not belong in that backyard. (*Id.*) She opened the gate and called Haskins toward her. (*Id.*) Haskins began moving backward toward Agent Foose while yelling "Sara!" (for Sara Grey, the owner of 268 Calder Street) at the top of his lungs. (*Id.*) Agent Foose had Officer McGowan, who entered the backyard after examining the trash can, step in to watch Haskins. (*Id.*) Agent Foose then realized that the backdoor to 268 Calder Street was not a metal door, and soon after observed a metal charcoal grill in the backyard. (*Id.*) She approached the grill and opened it, recognizing the sound as the metal-on-metal sound she had heard moments earlier. (*Id.*) Agent Foose observed a firearm resting inside the grill. (*Id.* at 111–112.) That gun was large and heavy. (*Id.* at 21.)

While Agent Foose was examining the grill, Officer McGowan approached Haskins at the gate of 268 Calder Street and frisked him for weapons. (*Id.* at 18.) The weapons frisk was negative, but as Officer McGowan felt over the right pocket of Haskins' sweatpants, it was "immediately apparent that he had a large amount of crack cocaine in his pocket." (*Id.*) Haskins was then arrested.

Haskins also testified in his defense at the suppression hearing. Upon the court's review of his testimony, the court finds Haskins largely credible. He

testified frankly and the court credits his candor despite the potentially grave legal implications of his decision to testify.

According to Haskins, he spent a lot of time in the area of Susquehanna and Calder Streets because of his romantic association with Sara Grey ("Grey"), the owner of 268 Calder Street, and because he sold drugs in the area. (Tr., at p. 184.) Haskins, with the ostensible permission of Grey, would store his drugs, gun, and bicycle in Grey's backyard. (*Id.* at 185.) Haskins would give Grey money, buy her clothing, as well as purchase alcohol for her and supply her with pain medication. (*Id.* at 185–186.) Their romantic involvement was seemingly limited to the daylight hours while Grey's husband was not home, although Grey would also come to Haskins' home in evenings when her husband returned. (*Id.* at 186–187.)

Although Grey testified that Haskins had only entered her home on two occasions, that he only had permission to store his bike in the backyard on occasion, and that the relationship ended in July 2018, the court deems Grey's testimony as implausible. Letters written by Grey in October and November 2018, after the evening in question, were introduced by Haskins at the suppression hearing, and these letters indicate that the relationship had not actually ended in the summer. ( Def. Exs. 23, 24, 25.) While the court cannot fully resolve these factual discrepancies between Grey's and Haskins' testimony, it is sufficient for purposes

of this motion to simply deem Grey's testimony as incredible—the letters introduced by Haskins in combination with his credible testimony cause the court to believe Haskins' recollection of their relationship and discredit Grey's entire testimony.

On the evening in question, Haskins retrieved his bike from Grey's backyard, walked to the front of the house and texted Grey, asking her to come outside. (Tr., p. 188.) Grey said she was busy and would come out later. (*Id.*) After waiting five or ten minutes, Haskins got up from the porch on Calder Street. (*Id.*) In one hand was an empty plastic juice container, which he had grabbed with two fingers because he was also holding his cell phone in the same hand. (*Id.* at 189.) In the other hand, he grabbed his Bluetooth speaker. (*Id.*) Haskins walked briefly down Calder Street and made an immediate left onto Susquehanna Street. (*Id.*) He then approached the trash can next to the backyard fence. (*Id.*) To dispose of the plastic juice container, he needed to use his left elbow to flip the lid open. (*Id.*) Haskins admitted he had a gun on the right side of his sweatpants, secured in place by the drawstring of his pants. (*Id.* at 191.)

As Haskins opened the gate to 268 Calder Street to enter the backyard, he heard the presence of the officers' SUV behind him. (*Id.* at 190.) Haskins contends he never saw the car before that moment, and he did not know the occupants of the vehicle were police officers. (*Id.*) As the officers approached "in

a hurried manner," Haskins shut the gate "almost" on Agent Foose's face. (*Id.*) Haskins then tried to bang on Grey's door so she could come outside and tell the officers that he was allowed to be in her backyard. (*Id.* at 191.) As Agent Foose yelled at him to exit the yard, he stopped banging and walked towards the fence. (*Id.* at 191–192.) Realizing he had the gun in his waistband and wanting to avoid a confrontation with the officers with the gun, he "discretely" (so that there would be no noise) placed the gun in the charcoal grill. (*Id.* at 192.) Haskins then went back towards the gate, where he was frisked, searched, and soon placed under arrest.

## DISCUSSION

There are two pieces of physical evidence which Haskins seeks to suppress: (1) the drugs found on his person during Officer McGowan's frisk, which Haskins contends must be suppressed as the fruit of an unlawful frisk conducted without reasonable suspicion; and (2) the gun found in the metal grill, which Haskins contends must be suppressed because he had a legitimate expectation of privacy in the backyard of 268 Calder Street.[2] The court will consider each argument in turn.

---

[2] The suppression of the third item of physical evidence—the drugs found in the trash can outside 268 Calder Street—is not requested by Haskins in his motion.

### A. Haskins' Challenge to the Lawfulness of Officer McGowan's *Terry* Frisk

Haskins first contends that the officers lacked reasonable suspicion to seize him and subject him to a frisk, during which pat-down search Officer McGowan identified crack cocaine in his pocket.

Pursuant to *Terry v. Ohio*, 392 U.S. 1 (1968), and its progeny, police officers acting without a warrant may "conduct a brief, investigatory stop when the officer[s] ha[ve] a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Brown*, 765 F.3d 278, 289 (3d Cir. 2014) (citations omitted). Reasonable suspicion requires "a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Hester*, 910 F.3d 78, 84 (3d Cir. 2018) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). The suspicion necessary for a valid *Terry* frisk is less than probable cause, but more than a hunch. *Navarette v. California*, 572 U.S. 393, 397 (2014). Reasonable suspicion is evaluated under the "totality of the circumstances." *United States v. Navedo*, 694 F.3d 463, 468 (3d Cir. 2012). Relevant factors to consider include: "(1) a high crime rate in the area, (2) a late hour at night, (3) nervous or evasive behavior by the suspect, and (4) other behavior by the suspect that indicates criminal activity to a police officer's expert eye." *United States v. Sears*, 835 F. App'x 671, 674 (3d Cir. 2020) (citing *Brown*, 448 F.3d at 251).

Here, the court finds that Officer McGowan and Agent Foose had reasonable suspicion that criminal activity was afoot such that the investigatory stop and frisk in the backyard of 268 Calder Street passes constitutional muster.  First, the officers observed Haskins walking alone at night in a high-crime, high-drug area of Harrisburg.  These two factors, standing alone, are insufficient for reasonable suspicion.  *Sears*, 835 F. App'x at 674 (citing *United States v. Goodrich*, 450 F.3d 552, 561–62 (3d Cir. 2006)).[3]  But Haskins was also behaving in a manner that "conform[ed] to [the] officers' specialized knowledge of criminal activity." *Id.* (quoting *Brown*, 448 F.3d at 251).  Indeed, this is true even though the court deemed Haskins to be a credible witness.  The court observes that Haskins' testimony was remarkably consistent with the officers' testimony.  Specifically, it is undisputed that Haskins was walking in a manner suggestive of someone with a gun in his waistband, because Haskins admitted he *was* walking down the road with a gun in his waistband.  And, when Haskins approached the trash can, he *did* open it in a strange, unnatural manner: he said he opened it using his elbows, which is consistent with the officers' perception of him spreading his arms wide.

---

[3] In *Sears*, which Haskins points to in support of his argument to suppress the evidence, there was video evidence that contradicted the police officers' testimony that the defendant was acting nervously or evasively, or in a manner indicative of criminal activity. *Sears*, 835 F. App'x at 674.  In this case, however, the testimony of both the officers and Haskins indicates that Haskins likely was behaving in a manner indicative of criminal activity in the eyes of an experienced police officer, and there is no evidence discrediting the officers' recollection.  As a result, the court finds *Sears* distinguishable.

The officers then observed him moving into the backyard of the home next to the trashcan.

From a reasonable officer's perspective, all of these actions align with a reasonable suspicion that the man they were following was either armed (as evidenced by either movements toward his waistband, or his slow gait potentially evincing a heavy gun at his waist), or was carrying and attempting to dispose of contraband (as evidenced by his opening of the seemingly random trashcan on a residential street on which he had just turned).  This remains the case even accepting Haskins' testimony that he did not know the officers were trailing him and that he therefore did not act nervously or evasively.  The bottom line is that Haskins was behaving in a manner suggestive of criminal activity from the perspective of experienced police officers.  Besides, it is well-established that "searches and seizures based on mistakes of fact can be reasonable." *Heien v. North Carolina*, 574 U.S. 54, 61 (2014).  The factual dispute over whether Haskins did or did not see the officers driving behind him is therefore not dispositive.

While Haskins points to several minor inconsistencies between the officers' incident reports and their testimony, these inconsistencies are immaterial.  They also fail to undermine the central predicament faced by Haskins here: his testimony

11

buttresses, rather than discredits, the officers' observations.[4] Again, Haskins admitted to walking alone at night in a high crime area, with a gun in his waistband, throwing an object in a residential trashcan in an unnatural manner, and then stepping into the backyard at nearly the same moment the officers pulled up beside him. Even accepting his testimony as largely true and credible, Haskins' version of events is still consistent with a finding of reasonable suspicion on the part of the officers that Haskins was armed; that he discarded contraband; and/or that he was attempting to avoid police contact.

Numerous Third Circuit decisions support a finding of reasonable suspicion under these circumstances. *See, e.g.*, *United States v. Terry*, 518 F. App'x 125, 128 (3d Cir. 2013) (finding reasonable suspicion based on the defendant's "series

---

[4] Further, while Haskins attempts to explain away each of his movements as suggestive of purely legal, rather than illegal activity—even though Haskins *was* admittedly committing crimes due to his illegal possession of a firearm as well as illicit drugs—the "core problem" with this argument is that Haskins "invite[s] the court to cast aside each individual piece of evidence that is capable of an innocent or alternative justification at the expense of viewing that evidence as a collective whole." *United States v. Harden*, No. 1:19-CR-0064, 2020 WL 6119278, at *6 (M.D. Pa. Oct. 16, 2020); *see also United States v. Arvizu*, 534 U.S. 266, 275–76 (2002) (finding that acts individually susceptible to innocent explanation can collectively amount to reasonable suspicion); *United States v. Gonzalez*, 630 F. App'x 157, 161 (3d Cir. 2015) ("Indeed, a proper evaluation of the totality of the circumstances cannot be reduced to distinct factors taken in isolation, and a number of activities, even if entirely legal and innocent themselves, may 'warrant[ ] further investigation.'") (quoting *Arvizu*, 534 U.S. at 27)); *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) (noting that reasonable suspicion may be found even by observing "exclusively legal activity"). Haskins cites *United States v. Bullock*, 839 F. App'x 662 (3d Cir. 2021), where the Third Circuit ruled that officers who only observed the defendant perform entirely legal activity had no reasonable suspicion to search him. But this case is clearly distinguishable; there was *nothing* the officers in *Bullock* observed that suggestive criminal activity, while, as discussed, there was here.

of suspicious movements," including a "shoving motion toward his waistband," leading the detective to believe he was concealing a weapon there); *United States v. Parker*, 142 F. App'x 19 (3d Cir. 2005) (finding facts "plainly gave rise to a reasonable suspicion sufficient for an investigative stop" where defendant was in a neighborhood "plagued by drug activity" and defendant "adjusted his waistband . . . consistent with the possession of a firearm"). Again, because Haskins' credible version of the events on the evening in question confirm that the officers observed a man acting in a manner suggestive of someone carrying a firearm and attempting to discard contraband, the court finds the officers possessed reasonable suspicion to stop Haskins and subject him to a *Terry* frisk.

### B. Haskins' Challenge to the Warrantless Search of the Backyard and Charcoal Grill

Haskins next argues that the gun found in the charcoal grill must be suppressed either because he had a legitimate expectation of privacy in the backyard of 268 Calder Street or, in the alternative, because the gun was only found as a result of an illegal seizure and it must be suppressed as fruit of the poisonous tree. (Doc. 138, pp. 12–14.)[5] Because the court already deemed the officers' seizure of Haskins to be based on reasonable suspicion and therefore

---

[5] For ease of reference, the court utilizes the page numbers from the CM/ECF header.

13

lawful, the court will only separately consider whether Haskins possessed a legitimate expectation of privacy in the backyard where the gun was found.

The Fourth Amendment protects those areas where a person has a reasonable expectation of privacy. *See United States v. Ortiz*, No. 1:10-CR-131, 2010 WL 3701340, at *3 (M.D. Pa. Sept. 14, 2010), *aff'd*, 483 F. App'x 712 (3d Cir. 2012). To determine whether the defendant had a reasonable expectation of privacy, courts use a two-part test. First, the individual must have a subjective expectation of privacy in the area or object he claims is protected. *Id.* Second, the expectation of privacy must be one that society is willing to recognize. *Id.* (citing *Katz v. United States*, 389 U.S. 347, 361 (1967) (Harlan, J., concurring)). "Determining whether this second type of search occurred involves two questions: '(1) whether the individual demonstrated an actual or subjective expectation of privacy in the subject of the search or seizure; and (2) whether this expectation of privacy is objectively justifiable under the circumstances.'" *United States v. Stanley*, 753 F.3d 114, 118–19 (3d Cir. 2014) (quoting *Free Speech Coal., Inc. v. Att'y Gen. of U.S.*, 677 F.3d 519, 543 (3d Cir. 2012)). To be objectively justifiable, the expectation of privacy must be one that society is willing to recognize as legitimate. *Id.* (citing *United States v. Jacobsen*, 466 U.S. 109, 122 (1984)).

Haskins bases his assertion of an expectation of privacy in the backyard on two arguments: that he had been granted unlimited access to Grey's backyard, and

that he had an ongoing romantic relationship with Grey as of the night in question. The court rejects both of Haskins' arguments. Although the court accepts Haskins' testimony that he had permission to enter the backyard to store certain items and that Haskins and Grey had an ongoing romantic relationship at the time, there is still no objectively justifiable expectation of privacy in the backyard. To the extent that Haskins had permission to enter the backyard, he testified that he had express permission to store guns, drugs, and his bike in the backyard, which was granted "[i]n exchange" for cash, clothes, sneakers, and electronics. (Tr., p. 185.) Haskins had explained to Grey that "it would be safer for [him] to have [drugs and a gun] in the yard instead of just sitting out front" with the items on his person. (*Id.*) While this arrangement to stash illegal items might generate a *subjective* expectation of privacy in the backyard, the court does not consider this an expectation that society would recognize as objectively justifiable. Indeed, Haskins' expectation of privacy in the backyard amounts to no more than a "subjective expectation of not being discovered." *Rakas v. Illinois*, 439 U.S. 128, 143 n. 12 (1978).

And while the court believes Haskins when he testified that he had an ongoing relationship with Grey on the evening in question, Haskins' own testimony belies a finding that he was an overnight guest at 268 Calder Street. In *Minnesota v. Olson*, 495 U.S. 91 (1990), the Supreme Court held that an overnight guest in the house of another has a legitimate expectation of privacy for as long as

15

they are in the home.  The Court explained that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society . . . [and] [f]rom the overnight guest's perspective, he seeks shelter in another's home precisely because it provides him with privacy." *Olson*, 495 U.S. at 98–99.

There is nothing on the record to support a finding that Haskins was ever an "overnight guest" at 268 Calder Street.  Haskins explained that he would spend time at 268 Calder Street during daytime hours while Grey's husband worked. (Tr., p. 186).  When the husband returned to 268 Calder Street, Haskins would leave, and Grey would then go to his house.  (*Id.*)  It appears that Haskins never spent a single night at 268 Calder Street, much less on the evening in question. The fact that Haskins and Grey were involved in a romantic relationship "does not automatically give him a reasonable expectation of privacy in her house," especially considering Haskins was "not living in her house."  *United States v. Pettiway*, 429 F. App'x 132, 135 n.3 (3d Cir. 2011).  This arrangement is "too far afield from 'the overnight guest relationship in *Olson* to suggest a degree of acceptance into the household." *Id.* at 135 (quoting *Minnesota v. Carter*, 525 U.S. 83, 90 (1998)); *see also United States v. Rose,* 613 F. App'x 125, 129–30 (3d Cir. 2015) ("Perhaps in the future, it may be necessary for us to decide whether Fourth Amendment rights attach somewhere on the spectrum between 'overnight guest'

and 'merely present with the consent of the householder.' We need not do so now, however, because, as ample precedent demonstrates, this case does not present a close call.").

Because there is no basis on the record before the court to conclude that Haskins had an objectively justifiable expectation of privacy, the court will deny the motion to suppress the gun found in the charcoal grill in the backyard of 268 Calder Street.

## CONCLUSION

For the reasons stated herein, the court will deny Haskins' motion to suppress. An appropriate order will issue.

s/Jennifer P. Wilson
JENNIFER P. WILSON
United States District Court Judge
Middle District of Pennsylvania

Dated:  September 8, 2021